ACCEPTED
01-15-00625-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
11/5/2015 3:07:42 PM
CHRISTOPHER PRINE
CLERK

NO. 01-15-00625-CV

IN THE COURT OF APPEALS FOR THE
FIRST DISTRICT OF TEXAS AT HOUSTON

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
11/5/2015 3:07:42 PM
CHRISTOPHER A. PRINE
Clerk

GULF COAST INTERNATIONAL, L.L.C.,

*Appellant*

v.

THE RESEARCH CORPORATION OF THE UNIVERSITY OF HAWAII,

*Appellee*

On appeal from the 333rd Judicial District Court, Harris County, Texas
The Honorable Joseph J. "Tad" Halbach, Jr. presiding
Cause No. 2014-05868

**BRIEF OF APPELLEE**

Blank Rome LLP

Michael K. Bell
State Bar No. 02081200
717 Texas Ave., Suite 1400
Houston, Texas 77002
Telephone: (713) 228-6601
Facsimile: (713) 228-6605
mbell@blankrome.com

Blank Rome LLP

David Meyer
State Bar No. 24052106
717 Texas Ave., Suite 1400
Houston, Texas 77002
Telephone: (713) 228-6601
Facsimile: (713) 228-6605
dmeyer@blankrome.com

Attorneys for Appellee

November 5, 2015

144163.06501/101687931v.1

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......................................................................... iii

RECORD REFERENCES AND ABBREVIATIONS ............................................. vi

ISSUES PRESENTED ................................................................................. vii

RCUH'S STATEMENT OF FACTS ................................................................. 1

    A.    GCI's Lawsuit Against RCUH ........................................................ 1

    B.    RCUH ....................................................................................... 2

    C.    The R/V KOK ............................................................................ 3

    D.    GCI .......................................................................................... 4

    E.    The September 11, 2012 Purchase Order ....................................... 4

    F.    November 2013 Interim Proposal and Payment Agreement ............. 5

    G.    Stewart & Stevenson and ABS ...................................................... 6

RCUH'S OBJECTIONS TO GCI'S STATEMENT OF FACTS ............................ 8

    A.    "Commercial" Vessel Allegations ................................................. 9

    B.    Alleged "Contacts" With Jack Van Vleit in Houston ...................... 10

    C.    GCI's Allegations that RCUH "Solicited" GCI in Texas ................. 11

    D.    "Ex Works" ............................................................................... 12

    E.    Objections to Hearsay Statements ................................................ 13

STANDARD OF REVIEW ........................................................................... 14

SUMMARY OF THE ARGUMENT ............................................................... 15

ARGUMENT/AUTHORITIES ....................................................................... 17

    A.    Special Appearance ................................................................... 17

i

B.     Personal Jurisdiction ........................................................................17

C.     RCUH Negated Specific Jurisdiction.................................................19

      a.     Alleged Texas contacts do not establish specific jurisdiction ................................................................22

      b.     The alleged "long-term relationship" between RCUH and GCI does not establish specific jurisdiction ............................29

      c.     Alleged "solicitation" of GCI fails to establish specific jurisdiction ................................................................33

D.     RCUH Negated General Jurisdiction .................................................35

E.     Exercising Jurisdiction over RCUH Would Violate Traditional Notions of Fair Play and Substantial Justice .......................................42

CONCLUSION AND PRAYER .........................................................................43

Appendix

Tab A:     GCI's Louisiana Lawsuit Filings

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*360-Irvine, LLC v. Tin Star Dev., LLC*,
    05-14-00412-CV, 2015 WL 3958509 (Tex. App.—Dallas June 30,
    2015, no pet.) (mem. op.)................................................................32

*Alenia Spazio, S.p.A. v. Reid*,
    130 S.W.3d 201 (Tex.App. —Houston [14th Dist.] 2003, pet.
    denied)...........................................................................................23

*Alstam Power, Inc. v. Infrassure, Ltd.*,
    2010 WL 521105, (Tex. App. —Austin 2010, no pet.) (mem. op.)...................43

*American Type Culture Collection, Inc. v. Coleman*,
    83 S.W.3d 801, 805–06 (Tex. 2002), *cert. denied*, 537 U.S. 1191,
    123 S.Ct. 1271, 154 L.Ed.2d 1025 (2003).............................14, 17, 41

*Asahi Metal Indus. Co., Ltd. v. Superior Court of Cal., Solano County*,
    480 U.S. 102, 107 S.Ct. 1026 (1987)...................................................17

*Barnstone v. Congregation Am Echad*,
    574 F.2d 286 (5th Cir. 1978) ............................................................23

*BMC Software Belgium, N.V. v. Marchand*,
    83 S.W.3d 789 (Tex. 2002).......................................................14, 17, 18

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462, 105 S. Ct. 2174 (1985).......................................18, 20, 31

*City of Keller v. Wilson*,
    168 S.W.3d 802 (Tex. 2005) ..............................................................14

*Command-Aire Corp. v. Ontario Mech. Sales & Serv. Inc.*,
    963 F.2d 90 (5th Cir. 1992) .........................................................31, 32

*Daimler AG v. Bauman*,
    134 S. Ct. 746, 187 L. Ed. 2d 624 (2014)......................................16, 35

144163.06501/101687931v.1

*Dalton v. R & W Marine, Inc.*,
897 F.2d 1359 (5th Cir. 1990) ...................................................................41

*Dukatt v. Dukatt*,
355 S.W.3d 231 (Tex. App.—Dallas 2011, pet. denied)...................................14

*Electrosource, Inc. v. Horizon Battery Technologies, Ltd.*,
176 F.3d 867 (5th Cir. 1999) ...................................................................31

*Freudensprung v. Offshore Technical Servs., Inc.*,
379 F.3d 327 (5th Cir. 2004) ...................................................................23

*Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*,
815 S.W.2d 223 (Tex. 1991) ............................................ 18, 19, 20, 35, 42, 43

*Haddad v. ISI Automation Int'l, Inc.*,
No. 04–09–00562–CV, 2010 WL 1708275 (Tex.App. —San
Antonio Apr. 28, 2010, no pet.) (mem. op.) .................................................23

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
466 U.S. 408, 104 S. Ct. 1868 (1984).........................................18, 20, 35, 36, 41

*Holt Atherton Indus., Inc. v. Heine*,
835 S.W.2d 80 (Tex. 1992).......................................................................14

*Int'l Shoe Co. v. Washington*,
326 U.S. 310, 66 S. Ct 154 (1945)................................................................18

*Internet Adver. Group, Inc. v. Accudata, Inc.*,
301 S.W.3d 383 (Tex. App.—Dallas 2009, no pet.) ..........................................41

*KC Smash 01, LLC v. Gerdes, Hendrichson, Ltd., L.L.P.*,
384 S.W.3d 389 (Tex. App.—Dallas 2012, no pet.) .......... 22, 23, 24, 25, 27, 29

*Mar. Overseas Corp. v. Ellis*,
971 S.W.2d 402 (Tex. 1998) ...................................................................15

*Moki Mac River Expeditions v. Drugg*,
221 S.W.3d 569 (Tex. 2007) ...........................................................18, 19, 20

*Moncrief Oil Int'l Inc. v. OAO Gazprom*,
414 S.W.3d 142 (Tex. 2013) ...................................................................19

iv

*N. Coast Commercial Roofing Sys., Inc. v. RMAX, Inc.*,
130 S.W.3d 491 (Tex. App.—Dallas 2004, no pet.) ...........................................32

*National Indus. Sand Ass'n v. Gibson*,
897 S.W.2d 769 (Tex. 1995) .................................................................17

*Nogle & Black Aviation, Inc. v. Faveretto*,
290 S.W.3d 277 (Tex. App.—Houston [14th Dist.] 2009, no pet.) ...................32

*Olympia Capital Associates, L.P. v. Jackson*,
247 S.W.3d 399 (Tex. App.—Dallas 2008, no pet.) ....................................21, 25

*Parex Res., Inc. v. ERG Res., LLC*,
427 S.W.3d 407 (Tex. App.—Houston [14th Dist.] 2014), *reh'g
overruled* (Mar. 6, 2014).................................... 15, 18, 19, 20, 34, 35, 36, 38, 41

*Retamco Operating, Inc. v. Republic Drilling Co.*,
278 S.W.3d 333 (Tex. 2009) .................................................................19, 32

*Rynone Mfg. Corp. v. Republic Indus., Inc.*,
96 S.W.3d 636 (Tex. App.—Texarkana 2002, no pet.)......................................33

*Sw. Offset, Inc. v. Hudco Pub. Co., Inc.*,
622 F.2d 149 (5th Cir. 1980) ................................................................31

*Tabor, Chhabra & Gibbs, P.A. v. Medical Legal Evaluations, Inc.*,
237 S.W.3d 762 (Tex.App. —Houston [1st Dist.] 2007, no pet.).....................23

*World-Wide Volkswagen Corp. v. Woodson*,
444 U.S. 286, 100 S. Ct. 559 (1980)..........................................................18, 20

*Yeng v. Zou*,
407 S.W.3d 485 (Tex. App. —Houston [14th Dist.] 2013, no pet.) .................15

*Zamarron v. Shinko Wire Co., Ltd.*,
125 S.W.3d 132 (Tex. App.—Houston [14th Dist.] 2003, pet.
denied)...........................................................................................17

## Other Authorities

Texas R. App. Proc. 38.1(g) ..................................................................8

Texas R. Civ. Proc. 120a .....................................................................17

144163.06501/101687931v.1

Texas R. Evid. 802 ............................................................................................13

## RECORD REFERENCES AND ABBREVIATIONS

"CR__," refers to the Clerk's Record filed August 20, 2015, indicating the page number of the reference.

"1st SUP. CR__," refers to the 1st Supplemental Clerk's Record filed on October 7, 2015, indicating the page number of the reference.

"RR __:__" refers to the Reporter's Record of the proceedings in the Trial Court on June 5, 2015, indicating the page number(s) and line(s) of the reference.

"GCI" refers to Appellant Gulf Coast International, L.L.C.

"RCUH" refers to Appellee The Research Corporation of the University of Hawai'i.

"KOK" refers to the R/V (research vessel) Ka`imikai-O-Kanaloa.

144163.06501/101687931v.1

# ISSUES PRESENTED

RCUH identifies the issues as follows:

1. Whether the trial court properly granted RCUH's special appearance because the trial court lacked specific and general jurisdiction over RCUH, an agency of the sovereign State of Hawai'i with its principal place of business in Honolulu, Hawai'i.

2. Whether the trial court's judgment should be affirmed because the exercise of jurisdiction over RCUH would offend traditional notions of fair play and substantial justice.

144163.06501/101687931v.1

# RCUH'S STATEMENT OF FACTS

## A.    GCI's Lawsuit Against RCUH

GCI's brief glosses over the fact that the underlying lawsuit at issue in this appeal concerns a variety of breach of contract causes of action that GCI asserted against RCUH for work GCI claims to have performed beginning on or after September 11, 2012, on the vessel R/V Ka`imikai-O-Kanaloa (hereafter the "R/V KOK"). CR 5-7.  Specifically, GCI alleged as follows in its Original Petition:

> "7.    On or about August 4, 2012, at RCH's request, GCI presented RCH with a Two Hundred Eighty Six Thousand Two hundred Eleven Dollars and 00/100 ($286,211.00) Proposal, ("Proposal") to upgrade certain electronics ("First Contract") upon RCH's marine research vessel, the "Ka`lmikai-O-Kanaloa." ("Vessel")

> "8.    RCH accepted GCI's Proposal and issued Purchase Order No. Z10007175 on September 11, 2012 and GCI proceeded with the first contract work.

> "9.    While performing the First Contract Work, GCI determined that various decades old, obsolete, defective, and deteriorated electrical components on the Vessel, whose unreliability and poor condition would adversely affect the electrical controls and computer components installed by GCI pursuant to the First Contract, needed to be upgraded and replaced.  Pursuant to discussions with, and approval by, the authorized representations of RCH and the Vessel, GCI and RCH agreed that GCI would replace the unrelated obsolete, defective and deteriorated electrical components on the Vessel on a time and material and open account basis.  ("Second Contract") The Second Contract work included, generally, demolition, removal, fabrication, replacement, and refurbishment of the Vessel's circuit breaker panels and assemblies, motor control contactor relay components, and related upgrades, all as approved by

1

RCH's authorized representatives. GCI's charges for the Second Contract work totals approximately Three Hundred Thirty-Five Thousand Three Hundred Twelve Dollars and 19/100 ($335,312.19)."

CR 6-7.

GCI claimed in its Petition that jurisdiction was proper because RCUH allegedly conducts business in Harris County, Texas and because "the acts and events complained of and the performance of the contract at issue partially occurred, and were [sic] performable, in Harris County, Texas." CR 5-6.

## B. RCUH

RCUH is not and never has been a resident of the State of Texas and does not conduct business in Texas. CR 41.[1] RCUH is an agency of the sovereign State of Hawai'i, established by the Hawai'i Legislature in 1965, and is attached to the University of Hawai'i for administrative purposes. *Id*. Its enabling legislation is codified as Chapter 304A, Sections 3001 to 3011 of the Hawai'i Revised Statutes. *Id*. The fundamental mission of RCUH is to support the research and training

---

[1] The cited reference is an affidavit from Leonard Ajifu dated February 3, 2015, which was included with RCUH's First Amended Special Appearance. CR41-42. Also included with the First Amended Special Appearance was an affidavit from Alexander Shor dated February 2, 2015. CR 43. RCUH also filed a second affidavit of Leonard Ajifu in reply to GCI's response to RCUH's First Amended Special Appearance. CR 438-440. GCI subsequently filed a number of objections to all three affidavits, to which RCUH responded in part by requesting leave to file amended affidavits specifying the basis of the affiants' personal knowledge of the facts set forth in their affidavit. CR 694-698. The trial court denied GCI's objections to the affidavits but granted RCUH leave to file the amended affidavits, CR 709, an order which GCI has not appealed. The amended affidavits are in the record as CR 699-700, CR 701-703, and 1st Sup. CR 3-4. For the convenience of the Court, RCUH cites herein are limited to the original affidavits.

2

programs of the University of Hawai'i and to enhance research, development, and training generally in Hawai'i. *Id.*  Its principal place of business is located in Honolulu, Hawai'i. *Id.*  RCUH:

a.  has no offices in Texas (*Id.*);

b.  does not have a registered agent for service of process in Texas (*Id.*);

c.  has no bank accounts, property, or assets in Texas (*Id.*);

d.  does not own or lease any interest in any real estate or other assets in Texas (*Id.*);

e.  does not design, manufacture, or sell products in Texas (CR 42); and/or,

f.  does not recruit Texas residents, directly or through any intermediary located in Texas, for employment inside or outside Texas (*Id.*).

## C.  The R/V KOK

The KOK is a 223' single-hulled research vessel owned by the State of Hawai'i and operated by the University of Hawai'i. CR 43.  The ship was modified in 1993 to serve as the primary support ship for two or three submersibles, but also functions as a multi-purpose oceanographic research vessel. *Id.*  Over 1050 square feet of space is provided in four different laboratories and over 3000 square feet of exterior working space is available on the aft main deck, the aft 01 deck, and the hangar. (*Id.*)  The KOK operates out of its home port of Honolulu, Hawai'i and has worked throughout the Pacific over the past two decades. *Id.*

3

**D. GCI**

While GCI's brief focuses almost entirely on its claimed Texas presence, GCI admits it is a Louisiana Limited Liability Company. CR 5. GCI's filings with the Texas Secretary of State for 2010 through 2014 list its principal place of business and principal office as being in West Iberia, Louisiana. CR 44-48. GCI's website indicates that GCI has a manufacturing plant in Louisiana. CR 590.[2]

Further, while GCI places a great deal of emphasis on its alleged long-time business relationship with RCUH and/or the KOK, RCUH's records show that between 2004 and the issuance of the September 11, 2012 Purchase Order, a period of approximately eight years, RCUH's payments to GCI totaled less than $100,000. CR 439.

**E. The September 11, 2012 Purchase Order**

On or about September 11, 2012, RCUH issued a purchase order to GCI that called for GCI to perform certain upgrades to the KOK (hereafter the "Purchase Order"). CR 42-43, CR 49-50. Significantly:

a. RCUH did not execute or issue the Purchase Order in Texas. (CR 42).

b. The RCUH Terms and Conditions included with the Purchase Order contain a Hawai'i choice of law provision. CR 50.

---

[2] Interestingly, after GCI filed the present appeal, GCI filed a lawsuit against RCUH in Louisiana asserting the exact same claims as it asserted herein. A copy of GCI's Louisiana Petition is included in Appellee's Appendix at Tab A.

4

c.  The Purchase Order contemplated that GCI's work on the KOK was to be performed outside of the state of Texas. CR 42.

d.  From at least the time the Purchase Order was issued through at least February 2, 2015, the KOK has not called at any Texas ports or entered Texas' territorial waters. CR 43.

e.  No employee or property of RCUH or member of the crew of the KOK ever traveled to Texas in connection with the Purchase Order. CR 42-43.

f.  As GCI does not dispute, all of the work GCI performed <u>on</u> the KOK took place outside the state of Texas. CR 42-43, CR 439; also see GCI's Brief at p. 4, footnote 6; CR 512. Specifically, GCI performed work on the KOK while the vessel was at sea or in port in Costa Rica, Panama, Oregon, and/or Hawai'i. CR 42-43.

g.  Any parts, equipment, or documents GCI provided to RCUH were delivered to RCUH outside of Texas. CR 439; also see GCI's Brief at p. 4, footnote 6; CR 513-514.

h.  None of the payments provided by RCUH to GCI for its work on the KOK were sent to the state of Texas. CR 42.

## F.  November 2013 Interim Proposal and Payment Agreement

On page 9 of its Statement of Facts, GCI points to the Interim Payment and PLC Proposal Agreement that RCUH signed in November 2013. It is not clear from GCI's pleadings in this case whether GCI is alleging that this is one of the two contracts referenced in its Petition (i.e., the First and Second Contracts). Regardless, the evidence before the trial court established the following:

a.  The Interim Payment and PLC Proposal Agreement was entered into while the KOK was dry-docked in Portland, Oregon in November 2013. CR 438. At that time the KOK control systems that GCI had installed pursuant to the original September 11, 2012, Purchase Order Z10007175 were still not functioning properly and RCUH needed GCI

5

to complete the required work in order for the ship to return to its home port in Honolulu, Hawai'i. *Id*. GCI refused to perform additional work until additional payments were made to them on the original Purchase Order. *Id*.

b.  Furthermore, GCI asserted that an upgrade costing $24,571 was required to get the ship operating properly. *Id*. The proposed upgrade, which including training to be provided to the KOK's crew, was set out in GCI's November 13, 2013, proposal. *Id*.

c.  Michael Hamnett, RCUH's Executive Director, signed the Interim Payment and PLC Proposal Agreement on November 13, 2013, at RCUH's offices in Hawai'i. *Id*. On that same date RCUH also issued a purchase order change in the amount of $24,571. *Id*. This purchase change order was also issued in Hawai'i. *Id*.

d.  All of the work GCI performed on the R/V KOK under the Interim Payment and PLC Proposal Agreement and/or the purchase order change, including any training provided to the KOK's crew, took place outside the state of Texas. CR 439. The final drawings provided by GCI under this agreement, which ended up being incorrect and which were started by Jack Van Vleit of GCI while he was aboard the KOK in Hawai'i, were delivered to RCUH in Hawai'i. *Id*.

e.  No employee or property of RCUH ever traveled to Texas in connection with the Interim Payment and PLC Proposal Agreement and/or the purchase order change. *Id*.

f.  RCUH issued two payments to GCI pursuant to the Interim Payment and PLC Proposal Agreement. CR 439. These payments were sent to GCI's address in Louisiana. *Id*.

g.  Any parts, equipment, and/or or documents provided by GCI to RCUH in connection with the Interim Payment and PLC Proposal Agreement and/or the purchase order change were delivered to RCUH outside the state of Texas. *Id*.

## G.  Stewart & Stevenson and ABS

On page 11 of its Statement of Facts, without citing any part of the record,

GCI asserts that "RCUH has also long called on other Texas equipment and service

6

providers beyond just GCI for KOK maintenance, inspection and upgrades."

Regarding the only two "providers" identified by GCI, Stewart & Stevenson and the

American Bureau of Shipping, or ABS, the evidence before the trial court

established the following:

- Between 1998 and September 9, 2012, RCUH ordered parts and/or equipment for the KOK from Stewart & Stevenson that Stewart & Stevenson shipped or sent to locations outside the state of Texas. CR 439. RCUH's records indicate that the last of the parts and/or equipment it ordered from Stewart & Stevenson were delivered by no later than October of 2012. *Id*.

- While certain parts/equipment Stewart & Stevenson provided to the KOK potentially could have been affected by GCI's work under the September 2012 Purchase Order, RCUH is unaware of Stewart & Stevenson having any involvement in GCI's work on the KOK after the September 11, 2012, Purchase Order was issued. *Id*.

- RCUH's records show that between 1998 and October 30, 2012, payments from RCUH to Stewart & Stevenson totaled $226,861.50. *Id*. RCUH's records show that no payments have been provided to Stewart & Stevenson after October 30, 2012. *Id*.

Regarding ABS, which RCUH denies is a "Texas vendor,"[3] the services ABS

provided to RCUH for the KOK were performed by personnel from ABS offices

---

[3] *See* CR 435, footnote 43, which is also set forth herein for the Court's convenience: "Since its founding in 1862, the American Bureau of Shipping (ABS), a New York not-for-profit corporation, has been committed to setting standards for safety and excellence as one of the world's leading ship classification societies. The mission of ABS is to serve the public interest as well as the needs of our members and clients by promoting the security of life and property and preserving the natural environment. ABS has been at the forefront of marine and offshore energy innovation for more than 150 years. In a constantly evolving industry, ABS works alongside its partners tackling the most pressing technical, operational and regulatory challenges so the marine and offshore industries can operate safely, securely and responsibly. The surveyors, engineers, researchers and regulatory specialists who form the ABS team work in more than 200 offices in 70 countries around the world providing traditional classification services as well as on-the-ground

7

outside of Texas in places including Honolulu, Portland, Seattle, and Panama, and RCUH's correspondence with ABS was with non-Texas offices/personnel. CR 362-385, CR 398-414, CR 439, CR 449-463. RCUH's records only contain the following three references to ABS Houston personnel:

a.  in a report on a survey conducted in Honolulu on January 11, 2011, there is a note stating that "[a]ny modifications to existing ABS Approved Main Propulsion drive train to be submitted to ABS Houston Engineer for approval prior to commencing modification (CR 401);

b.  in a report on a survey conducted in Honolulu on February 4, 2012, there is a note stating that manuals for a winch were to be submitted to the appropriate Houston Ship Engineering Department before the next annual hull survey (CR 405); and,

c.  in a report on a survey conducted in Honolulu on November 20, 2012, there is a note indicating that the winch manual had been submitted (CR 411).

Finally, RCUH's records reflect only a total of $55,831.00 in payments to ABS for the services to the KOK between September 2010 and January 2015. CR 464-477.

## RCUH'S OBJECTIONS TO GCI'S STATEMENT OF FACTS

RCUH makes the following objections to GCI's Statement of Facts and asserts that the portions objected to below violate Texas Rule of Appellate Procedure 38.1(g) ("Statement of Facts. The brief must state concisely and without argument the facts pertinent to the issues or points presented….The statement must be supported by record references.").

---

technical services in asset performance, energy efficiency, environmental performance and life cycle management." *See* http://ww2.eagle.org/en/about-us.html, (last accessed June 4, 2015).

144163.06501/101687931v.1

## A. "Commercial" Vessel Allegations

The uncontroverted evidence before the trial court established that the KOK is a research vessel. Despite this, GCI makes repeated references in its Statement of Facts to the KOK being a "commercial" research vessel. GCI's allegations in this regard are not supported by the record and should therefore be disregarded by this Court. Specifically:

- On page 2 of its Statement of Facts, GCI refers to the KOK as a "commercial marine research vessel" and cites to CR 26 for support. However, CR 26, which is page 2 of RCUH's First Amended Special Appearance, never refers to the KOK as a "commercial" vessel.

- Again on page 2, GCI asserts that "[t]he University operates the KOK under commercial contracts with third parties" and cites to CR 582-83 for support. However, CR 582-83 is a letter in which RCUH notifies GCI that due to GCI's poor work on the upgrade project, the KOK, which RCUH describes in the letter as a research vessel, was unable to perform a contract with NOAA (which, like RCUH and the University of Hawaii, is a government agency) and was therefore losing income. Nowhere in the letter is there a statement that the NOAA contract is a "commercial contract."

- On page 3 of its Statement of Facts, GCI claims that "[s]ince 1993, RCUH has engaged GCI…to keep the KOK in commercial operation" and cites to CR 104. CR 104 is a page from an affidavit from Jack Van Vleit of GCI, and nowhere in the affidavit does Mr. Van Vleit refer to the KOK as a "commercial" vessel.

- On page 4 of its Statement of Facts, GCI again refers to the KOK as a "commercial vessel" and cites to CR 104-05, the affidavit from Van Vleit, and CR 513, which is a second affidavit from Van Vleit filed with the Court after the June 5, 2015, hearing on RCUH's Special Appearance, for support. Again, nowhere in either affidavit does Van Vleit refer to the KOK as a "commercial" vessel.

9

**B.     Alleged "Contacts" With Jack Van Vleit in Houston**

On page 4 of its Statement of Facts, GCI asserts that "RCUH does not dispute that since 2006, RCUH directed roughly 90% of its contacts with GCI to Van Vleit in Houston and that GCI's Houston office, and Van Vleit in particular, were responsible for servicing RCUH's requests and needs to keep its commercial vessel in operation….Nor does RCUH dispute that RCUH was well aware of GCI's operations in Houston, Texas and knew that since 2006, GCI's Houston office was responsible for servicing RCUH's requests and needs." (Italics in original).

However, RCUH does dispute these assertions[4] and would note that the evidence before the trial court showed that many of RCUH's "contacts" with GCI were with GCI's Louisiana office/personnel and not its Texas office/personnel, calling into question Van Vleit's assertion that "90%" of RCUH's contacts with GCI were directed to him in Houston.  Specifically:

- GCI's proposals to RCUH contained both a Louisiana and Houston address (CR 52-53, CR 110-111, CR 153-159);

- RCUH's purchase orders were directed to GCI's Louisiana address (CR 49-50, CR 127-128, CR 135-136, CR 593-659);

- GCI's invoices contain only GCI's Louisiana address (CR 51, CR 55-65, CR 129-131, CR 137-140, CR 144-145, CR 151, CR 199);

- RCUH's payments to GCI were sent to GCI in Louisiana (CR 42, CR 439; and,

---

[4] *See* CR 590-591.

10

- RCUH's communications with GCI included GCI personnel who appear to have been based in Louisiana, not Texas (CR 660-693).

Additionally, even though Van Vleit claims that "RCUH over the past nine (9) years regularly solicited my analysis and advice in Houston," the email correspondence cited in his affidavit as support for this assertion only goes back as far as July 23, 2011, which is slightly less than four years from the date of his second affidavit. CR 513, CR 517-581.

## C. GCI's Allegations that RCUH "Solicited" GCI in Texas

On page 5 of its Statement of Facts, GCI alleges that RCUH does not "deny that it was the party repeatedly soliciting GCI's services." However, as GCI acknowledges in its Statement of Facts, RCUH objected when, following the June 5, 2015, hearing on RCUH's Special Appearance, GCI submitted a second affidavit from Van Vleit which raised the "solicit" allegation for the first time. *See* CR 587-590. Moreover, GCI's assertion that RCUH could have requested a continuance of the hearing in order to provide a controverting affidavit is both: 1) false, because the allegation was not raised until after the hearing; and, 2) improper argument in the guise of a "Statement of Facts."

Further, other than the self-serving allegations contained in Van Vleit's affidavit, there is no evidence supporting GCI's argument that RCUH "solicited" it. In fact, a review of the email correspondence included with the second Van Vleit affidavit reveals that it was **GCI**, not RCUH, who first proposed that **<u>GCI</u>** itself (as

11

opposed to one of the "number of U.S. companies" GCI claims "RCUH could have engaged to work on the KOK"[5]) perform the upgrades to the KOK that later became the subject of GCI's August 2011 and 2012 written proposals and the September 11, 2012 Purchase Order that was issued from Hawaii by RCUH. CR 517-519.[6]

Finally, RCUH notes that GCI alleges that RCUH has been its continuous customer since 1993.[7] Assuming *arguendo* that is correct, and assuming *arguendo* that RCUH "solicited" GCI at the start of their relationship (neither of which are admitted), this would appear to mean that the relationship began well before 2006, which is when Jack Van Vleit alleges he began managing GCI's relationship with RCUH from Houston,[8] and thus GCI has offered no evidence that the relationship between RCUH and GCI began in Texas.

### D. "Ex Works"

On page 7 of its Statement of Facts, GCI argues that certain language – "Gulf Coast International, LLC, New Iberia, LA prices are net ex-works 'EXW' Houston TX facility" – contained in an August 2011 proposal establishes that "RCUH was on notice that 'delivery" under this proposal would take place in Houston." The only "evidence" GCI provides to supports its interpretation of the phrase "ex works" is a

---

[5] *See* GCI's Statement of Facts at p. 11.
[6] RCUH would also note that Van Vleit's email of July 23, 2011, also states that a GCI employee in New Iberia (Louisiana), Tommy Broussard, had been tasked by Van Vleit with locating parts for RCUH, undercutting GCI's emphasis on its Texas "presence" in connection with RCUH.
[7] *See* GCI's Statement of Facts at p. 3.
[8] CR 104-105.

144163.06501/101687931v.1

website citation, and there is simply no evidence whatsoever that its inclusion in a GCI-issued proposal put RCUH on notice of anything.

Further, RCUH denies that the term has the meaning ascribed to it by GCI, but would note that it appears to be nothing more than a pricing term and is irrelevant. More significantly, the work GCI performed <u>on</u> the KOK took place outside of Texas. CR 42-43, CR 439. Any parts, equipment or documents GCI provided to RCUH (regardless of where or from whom GCI obtained them) were delivered to RCUH outside of Texas. CR 439.

**E.     Objections to Hearsay Statements**

On page 11 of its Statement of Facts, GCI states that "RCUH, as well as the KOK crew, have on numerous occasions stated that GCI's familiarity with and years of diligent service on KOK equipment, rendered GCI, despite GCI's location in Houston, Texas, RCUH's preferred provider for the KOK's electronic control system service work." GCI cites to CR 513, which is page 2 of Van Vleit's second affidavit, for support. While RCUH does not admit that any of the purported communications by RCUH personnel ever occurred as claimed by Van Vleit, RCUH objects to this evidence as constituting self-serving, inadmissible hearsay under Texas Rule of Evidence 802 and submits that the Court should therefore disregard this portion of GCI's Statement of Facts in its entirety.

13

**STANDARD OF REVIEW**

Whether a court has personal jurisdiction over a defendant is a question of law. *American Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 805–06 (Tex. 2002), *cert. denied*, 537 U.S. 1191, 123 S.Ct. 1271, 154 L.Ed.2d 1025 (2003). The trial court's decision to grant or deny a special appearance is subject to *de novo* review on appeal. *Id*. at 806. The trial court's factual findings supporting its ruling on the special appearance may be challenged for legal and factual sufficiency. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002). When the trial court does not issue findings of fact, all facts necessary to support the trial court's ruling and supported by the evidence are implied in favor of the trial court's ruling. *Id*. Appellate courts are required to affirm a trial court's ruling on a special appearance "on any legal theory finding support in the evidence." *Dukatt v. Dukatt*, 355 S.W.3d 231, 237 (Tex. App.—Dallas 2011, pet. denied).

When examining a legal-sufficiency challenge, appellate courts review the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). For legal sufficiency points, if there is more than a scintilla of evidence to support the finding, the no evidence challenge fails. *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992). The court is to credit favorable evidence if a reasonable fact finder could and disregard contrary evidence unless a

14

reasonable fact finder could not. *Id*. at 827. The evidence is legally sufficient if it would enable a reasonable and fair-minded person to find the fact under review. *Id*. The fact finder is the sole judge of witness credibility and the weight to give their testimony. *Id*. at 819.

In a factual-sufficiency review, the appellate court is to consider and weigh all the evidence, both supporting and contradicting the finding. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex. 1998). The court sets aside the finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Id*. at 407. The amount of evidence necessary to affirm a judgment is far less than that necessary to reverse a judgment. *Yeng v. Zou*, 407 S.W.3d 485, 489 (Tex. App. —Houston [14th Dist.] 2013, no pet.); *Parex Res., Inc. v. ERG Res., LLC*, 427 S.W.3d 407, 415 (Tex. App.—Houston [14th Dist.] 2014), *reh'g overruled* (Mar. 6, 2014).

## SUMMARY OF THE ARGUMENT

The order sustaining the special appearance in RCUH's favor should be affirmed. The evidence before the trial court conclusively demonstrated that RCUH did not purposefully avail itself of the privilege of doing business in Texas. The work that GCI was contractually required to perform – upgrading various systems on the KOK (i.e., removing old equipment from the KOK and installing new equipment on the KOK) – took place outside of Texas. Even GCI admits that all of

15

its work <u>on</u> the KOK took place outside of Texas and that all parts, equipment, materials, drawings, etc. it claims to have provided were actually delivered to RCUH outside of Texas.

Further, assuming *arguendo* that GCI established that it had a Texas presence, and/or that RCUH communicated by phone and/or email with GCI personnel while they (the GCI personnel) were located in Texas, and/or that GCI performed "preparatory" and/or "fabrication, engineering, and/or analysis" work in Texas, these are the exact types of contacts Texas and federal courts have held are not sufficient to establish specific jurisdiction over a foreign defendant.

Additionally, the evidence before the trial court established that there is no general jurisdiction over RCUH. As recently stated by the U.S. Supreme Court, "[a] court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State."[9] Taken as a whole, RCUH's contacts with Texas are not so 'continuous and systematic' as to render RCUH essentially at home in Texas.

Finally, the evidence before the trial court established that the assumption of jurisdiction over RCUH would offend traditional notions of fair play and substantial

---

[9] *Daimler AG v. Bauman*, 134 S. Ct. 746, 754, 187 L. Ed. 2d 624 (2014).

16

justice and deprive it of due process as guaranteed by the Fourteenth Amendment to the United States Constitution.

For all these reasons, the trial court's order should be affirmed.

**ARGUMENT/AUTHORITIES**

**A.      Special Appearance**

Under Texas Rule of Civil Procedure 120a, "a special appearance may be made by any party either in person or by attorney for the purpose of objecting to the jurisdiction of the court over the person or property of the defendant on the ground that such party or property is not amenable to process issued by the courts of this State." TEX. R. CIV. P. 120a.   The plaintiff has the initial burden of pleading sufficient allegations to bring the nonresident defendant within the provisions of the Texas long-arm statute. *American Type Culture Collection*, 83 S.W.3d at 806; *Marchand*, 83 S.W.3d at 793. The nonresident defendant then has the burden of negating all bases of personal jurisdiction. *National Indus. Sand Ass'n v. Gibson*, 897 S.W.2d 769, 772 (Tex. 1995); *Zamarron v. Shinko Wire Co., Ltd.*, 125 S.W.3d 132, 137 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).

**B.      Personal Jurisdiction**

The Due Process Clause of the Fourteenth Amendment operates to limit the power of a state to assert personal jurisdiction over a nonresident defendant. *Asahi Metal Indus. Co., Ltd. v. Superior Court of Cal., Solano County*, 480 U.S. 102, 108,

17

107 S.Ct. 1026, 1030 (1987); *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 413–14, 104 S. Ct. 1868, 1872 (1984). The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful contacts, ties, or relations. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471–72, 105 S. Ct. 2174, 2181 (1985); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 294, 100 S. Ct. 559, 565 (1980); *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319, 66 S. Ct 154, 160 (1945).

Texas courts do not have jurisdiction over a nonresident defendant unless the nonresident defendant has purposefully established "minimum contacts" with Texas and the court's exercise of jurisdiction over defendant comports with "fair play and substantial justice." *Burger King*, 471 U.S. at 474-76, 105 S. Ct. at 2184; *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 575 (Tex. 2007); *Marchand*, 83 S.W.3d at 795; *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 226 (Tex. 1991); *Parex*, 427 S.W.3d at 416.

Personal jurisdiction over a nonresident defendant is constitutional when two conditions are satisfied: (1) the defendant has established minimum contacts with the forum state; and (2) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *Marchand*, 83 S.W.3d at 795. Minimum contacts are sufficient for personal jurisdiction when the nonresident defendant purposefully

18

avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws. *Moki Mac*, 221 S.W.3d at 575. There are three aspects pertinent to a purposeful-avilment inquiry:

i.   only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or a third person;

ii.  the contacts relied on must be purposeful rather than random, fortuitous, or attenuated; and,

iii. the defendant must seek some benefit, advantage or profit by "availing" itself of the jurisdiction.

*Id*. This three-part inquiry assesses the quality and nature of the contacts, not the quantity. *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 339 (Tex. 2009). A defendant may purposefully avoid a particular forum by structuring its transactions in such a way as to neither profit from the forum's laws nor subject itself to jurisdiction there. *Moki Mac*, 221 S.W.3d at 575. At its core, the purposeful-avilment analysis seeks to determine whether a nonresident's conduct and connection to a forum are such that it could reasonably anticipate being haled into court there. *Parex*, 427 S.W.3d at 416 (citing *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 152 (Tex. 2013)).

**C.   RCUH Negated Specific Jurisdiction**

The United States Supreme Court has refined the minimum contacts analysis into specific and general jurisdiction. *Guardian Royal*, 815 S.W.2d at 227. When specific jurisdiction is asserted, the cause of action must arise out of or relate to the

19

nonresident defendant's contact with the forum state in order to satisfy the minimum contacts requirement. *Helicopteros*, 466 U.S. at 414 n. 8, 104 S. Ct. 1872 n. 8; *World-Wide Volkswagen Corp.*, 444 U.S. at 293-94. The minimum contacts analysis focuses on the relationship among the defendant, the forum and the litigation. *Helicopteros*, 466 U.S. at 414, 104 S. Ct. at 1872; *Parex*, 427 S.W.3d at 416. For a nonresident defendant's forum contacts to support an exercise of specific jurisdiction, there must be a substantial connection between those contacts and the operative facts of the litigation. *Moki Mac*, 221 S.W.3d at 585; *Parex*, 427 S.W.3d at 416. The nonresident defendant's activities must have been "purposefully directed" to the forum and the litigation must result from alleged injuries that "arise out of or relate to" those activities. *Burger King*, 471 U.S. at 472. Furthermore, the contact must have resulted from the nonresident defendant's purposeful conduct and not the unilateral activity of the plaintiff or others. *Guardian Royal*, 815 S.W.2d at 228; *Helicopteros*, 466 U.S. at 417, 104 S. Ct. at 1873; *World–Wide Volkswagen*, 444 U.S. at 298, 100 S. Ct. at 567.

RCUH met is burden to negate specific jurisdiction. More particularly, the undisputed evidence before the trial court established the following:

   a.   RCUH is an agency of the sovereign State of Hawaiʻi, established by the Hawaiʻi Legislature in 1965, is attached to the University of Hawaiʻi for administrative purposes, and has its principal place of business in Hawaiʻi. CR 41.

20

b.      The R/V KOK is a research vessel owned by the State of Hawai'i and operated by the University of Hawai'i. CR 43.

c.      The R/V KOK operates out of its home port of Honolulu, Hawai'i and has worked throughout the Pacific over the past two decades. CR 43.

d.      On or about September 11, 2012, RCUH issued a purchase order to GCI that called for GCI to perform certain upgrades and/or repairs to the R/V KOK. CR 42-43, CR 49-50.

e.      RCUH did not execute or issue the September 11, 2012 Purchase Order in Texas. CR 42.

f.      From at least the time the Purchase Order was issued through at least February 2, 2015, the R/V KOK has not called at any Texas ports or entered Texas' territorial waters. CR 43.

g.      No employee or property of RCUH ever traveled to Texas in connection with the September 11, 2012 Purchase Order. CR 42-43.

h.      As GCI does not dispute, all of the work GCI performed <u>on</u> the R/V KOK took place outside the state of Texas. CR 42-43, CR 439; also see GCI's Brief at p. 4, footnote 6; CR 512.   Specifically, GCI performed work on the R/V KOK while the vessel was at sea or in port in Costa Rica, Panama, Oregon, and/or Hawai'i. CR 42-43.

i.      Any parts, equipment or documents GCI provided to RCUH were delivered to RCUH outside of Texas. CR 439; also see GCI's Brief at p. 4, footnote 6; CR 513-514.

j.      None of the payments provided by RCUH to GCI for its work on the R/V KOK were sent to the state of Texas. CR 42.

Further, the Hawaiian choice of law provision in RCUH's Terms and Conditions (CR 49-50) is yet another indication that there was no purposeful availment by RCUH. *Olympia Capital Associates, L.P. v. Jackson*, 247 S.W.3d 399, 417 (Tex. App.—Dallas 2008, no pet.) ("Moreover, the Agency and Administration Agreement provides that its provisions 'shall be construed and interpreted in

21

accordance with the laws of the British Virgin Islands as from time to time in effect.'

Such a provision does not support an inference of purposeful availment.").

### a. Alleged Texas contacts do not establish specific jurisdiction

GCI's brief focuses only on its claimed presence in Texas. However, GCI admits it is a Louisiana Limited Liability Company (CR 5) and does not dispute that its filings with the Texas Secretary of State for 2010 through 2014 list its principal place of business and principal office as being in West Iberia, Louisiana. CR 44-48. GCI's website indicates that GCI also has a manufacturing plant in Louisiana. CR 590. There is no dispute that the September 11, 2012, Purchase Order was issued to GCI at its Louisiana address. CR 49-50. There is no dispute that payments from RCUH to GCI were sent to its Louisiana address. CR 42, CR 439. Many of RCUH's communications were with GCI personnel who appear to have been based in Louisiana (CR 660-693).

Regardless, the alleged Texas contacts that GCI points to in its brief are the exact type that Texas and federal courts have held <u>do not</u> establish specific jurisdiction:

- RCUH's alleged "awareness" that GCI personnel in Texas were working on/connected with the KOK project[10];

---

[10] *KC Smash 01, LLC v. Gerdes, Hendrichson, Ltd., L.L.P.*, 384 S.W.3d 389, 394 (Tex. App.—Dallas 2012, no pet.) ("Appellee framed its jurisdictional facts in terms of appellant's knowledge of appellee's residence and partial performance in Texas and its knowledge that the payments were due in Texas. However, if the acts themselves fail to establish minimum contacts and purposeful

22

- telephone calls and emails between RCUH and GCI personnel located in Texas[11];

- alleged performance of fabrication, engineering and analysis services by GCI personnel in Texas[12]; and,

- GCI personnel traveling from Texas to locations outside Texas to perform work for RCUH.[13]

availment, the defendant's knowledge of the relationship to Texas will not make the defendant amenable to jurisdiction.").

[11] *Alenia Spazio, S.p.A. v. Reid*, 130 S.W.3d 201, 213 (Tex.App. —Houston [14th Dist.] 2003, pet. denied) ("numerous telephone and facsimile communications with people in Texas relating to an alleged contract do not establish minimum contacts"); *Freudensprung v. Offshore Technical Servs., Inc.*, 379 F.3d 327, 344 (5th Cir. 2004) ("this Court has repeatedly held that the combination of mailing payments to the forum state, engaging in communications related to the execution and performance of the contract, and the existence of a contract between the nonresident defendant and a resident of the forum are insufficient to establish the minimum contacts necessary to support the exercise of specific personal jurisdiction over the nonresident defendant").

[12] *KC Smash*, 384 S.W.3d at 394; *Haddad v. ISI Automation Int'l, Inc.*, No. 04–09–00562–CV, 2010 WL 1708275, *5 (Tex.App. —San Antonio Apr. 28, 2010, no pet.) (mem. op.) (electronic-media-system designer's performance of work in Texas for Mexican client was designer's contact, not client's); *Tabor, Chhabra & Gibbs, P.A. v. Medical Legal Evaluations, Inc.*, 237 S.W.3d 762, 774 (Tex.App. —Houston [1st Dist.] 2007, no pet.) (decision of plaintiff, a Texas medical expert witness suing a Mississippi law firm, to perform in Texas most of his preparations for underlying medical-malpractice trial held in Mississippi was unilateral decision of plaintiff); and, *Barnstone v. Congregation Am Echad*, 574 F.2d 286, 289 (5th Cir. 1978); ("Assuming that plaintiff's endeavor in making the drawings, renderings and models in Texas constitutes partial performance, it is the opinion of the undersigned that the defendant's contacts with the State are insufficient to satisfy the Hanson and O'Brien tests of purposeful activity by defendant within the State of Texas. It was plaintiff who traveled to Maine for the purpose of making his presentation and was there awarded the commission. Numerous other trips to Maine were made by plaintiff for the purpose of discussing the plans, conferring with the Board of Incorporators, and soliciting bids for the construction and engineering of the synagogue. Supervision of actual construction could only take place within that State. Although plaintiff had no place of business in Maine, he was nonetheless obliged to and did procure a Maine license to perform the architectural services in that State. Although plaintiff in his brief states that payment was made through the mails and received by him from defendant, there is no evidence in the record to support this allegation. At best, plaintiff's activity in preparing the sketches in Texas would appear to constitute unilateral partial performance. It is well settled that the unilateral activity of those who claim some relationship with a non-resident defendant cannot satisfy the requirement of contact with the forum state.").

[13] *KC Smash*, 384 S.W.3d at 394; *Congregation Am Echad*, 574 F.2d at 289.

144163.06501/101687931v.1

The Dallas Court of Appeals' opinion in *KC Smash* is instructive on this point. *KC Smash* involved a franchisee with restaurants in Kansas. *Id*. at 391. The franchisee's place of business was in Kansas, and it did not conduct business in Texas or own property in Texas. The franchisee hired an architectural firm based in Dallas, Texas, to provide architectural services for the restaurants in Kansas. The parties' contract was oral, and they communicated by telephone and email. No employee of the franchisee ever traveled to Texas on business for the franchisee. The architectural firm's employees performed the majority of their work in Texas, and they traveled to Kansas to inspect the construction of the restaurants and to advise the franchisee. The franchisee paid the Texas firm by sending payments to its office in Dallas. When the franchisee failed to pay the amounts billed, the Texas firm brought suit in Dallas County for breach of contract, fraud, theft of services, fraudulent and negligent misrepresentation, unjust enrichment, sworn account, and quantum meruit. The franchisee filed a special appearance that the trial court denied. *KC Smash*, 384 S.W.3d at 390-91.

The franchisee appealed. The Dallas Court of Appeals noted that the Texas firm alleged the following in support of the trial court's exercise of jurisdiction over the franchisee:

- appellant knew that appellee's sole place of business was in Texas;

- appellant intentionally sought out appellee in Texas;

144163.06501/101687931v.1

- appellant hired appellee to provide architectural services in and from appellee's office in Texas;

- appellant entered into its contract with appellee through telephone calls and email to appellee in Texas;

- appellant communicated with appellee in Texas through email and telephone;

- appellant knew that the vast majority of appellee's work would be performed in its Texas office;

- appellant intentionally made payments and incurred debts payable to appellee at its Texas office; and,

- appellant made fraudulent and misleading representations to appellee in Texas.

*Id.* at 392-93.

Despite the foregoing, the Dallas Court of Appeals reversed the trial court, concluding that the appellant lacked sufficient minimum contacts with Texas to support the trial court's exercise of personal jurisdiction over appellant. *Id.* at 394. The Court of Appeals' analysis is set forth in full as follows:

> In this case, appellant, through its employees, never physically entered this state. Instead, its contacts with appellee in Dallas were through telephone and email communications and the sending of payments to appellee. None of these constitute a contact demonstrating purposeful availment. In *Olympia Capital Associates, L.P. v. Jackson*, 247 S.W.3d 399 (Tex.App. —Dallas 2008, no pet.), this Court concluded that communications through telephone and email regarding negotiation and performance of a contract between Texas plaintiffs and a foreign defendant were not contacts of the foreign defendant with Texas. *Id.* at 417; see also *id.* at 418 ("The existence of a contract between the nonresident defendant and a resident of the forum and engaging in communications related to the execution and performance of that

25

contract are insufficient to establish the minimum contacts necessary to support the exercise of specific personal jurisdiction over the nonresident defendant."). In *Michiana*, the [Texas] Supreme Court rejected telephone calls as evidence of purposeful availment:

> [C]hanges in technology have made reliance on phone calls obsolete as proof of purposeful availment. While the ubiquity of "caller ID" may allow nonresidents to know a caller's telephone number, that number no longer necessarily indicates anything about the caller's location. If jurisdiction can be based on phone conversations "directed at" a forum, how does a defendant avail itself of any jurisdiction when it can never know where the other party has forwarded calls or traveled with a mobile phone?

The same reasoning has been applied to email:

> Like telephone calls, emails do not necessarily indicate anything to the recipient about the sender's location. The physical address where one may send or retrieve an email is no more fixed to a particular location than the address where one may send or receive a telephone call. We see no reasoned basis for distinguishing between the two means of communication, particularly when many of the same devices can be used for both.

Likewise, fraudulent or negligent misrepresentations made through electronic media do not establish specific jurisdiction. Sending payments to Texas does not establish minimum contacts.

Appellee also alleged as a contact the fact that appellee performed the "vast majority" of the work under the contract in Texas. However, appellee's partial performance in Texas was a unilateral action by appellee, not appellant, and it cannot be considered a contact by appellant with Texas.

Moreover appellant did not "seek some benefit, advantage, or profit by 'availing' itself of the jurisdiction." Instead, appellant's "availing" was for the purpose of building its restaurants in Kansas, not for reaping a profit or obtaining a benefit or advantage in Texas.

Appellee framed its jurisdictional facts in terms of appellant's knowledge of appellee's residence and partial performance in Texas

26

and its knowledge that the payments were due in Texas. However, if the acts themselves fail to establish minimum contacts and purposeful availment, the defendant's knowledge of the relationship to Texas will not make the defendant amenable to jurisdiction.

*KC Smash*, 384 S.W.3d at 393-94 (internal citations omitted).

Regarding its claim to have performed "extensive design, manufacturing, assembly, sourcing and monitoring services in the state of Texas…,"[14] GCI provided no evidence that GCI itself "manufactured" anything for RCUH; instead, as shown below, GCI claimed to have "assembled" parts and equipment it had ordered from third parties:

> "Ajifu is correct that the onsite demolition, installation, and servicing of GCI's parts and components occurred outside of Texas. Given that the KOK is an ocean-going vessel and travels to various parts of the Pacific Ocean, those portions of the work would necessarily occur on the KOK. However, the analysis, planning, design, sourcing, ordering, assembly, and shipping of the specially fabricated components was performed by GCI for and at the request of RCUH in Houston, Texas. For example, the breaker assemblies, the unit racks for wiring, the drive control systems, the fuel supply controls, and the engine generator controls were all assembled and put together in specially fabricated component packages in Houston for shipment to Hawaii. In addition, all design drawings were drafted, revised, and completed personally by me in GCI's Houston facility." CR 512-513.

> "In addition to the hard parts and materials assembled by GCI in Houston, the final drawings requested by RCUH and prepared by GCI in connection with the 2012 GCI contract with RCUH and the later PLC Agreement were prepared in Houston and shipped to RCUH from GCI's Houston office." CR 513.

---

[14] *See* GCI's Brief at p. 21.

144163.06501/101687931v.1

"Ajifu is correct in stating that materials and equipment were *delivered to* the KOK outside of Texas. However, the materials and equipment were necessarily, as a result of the proprietary nature of GCI's specialized and complex electrical control component control assemblies, designed and assembled by GCI in Houston and *shipped from* GCI in Houston to RCUH and the KOK for installation wherever the KOK was located. GCI also, as part of GCI's work for RCUH on the KOK, sourced and ordered parts and equipment for RCUH and the KOK from other Texas-based suppliers and GCI personnel traveling from Houston to the KOK hand carried GCI's assemblies of parts and equipment to the KOK." CR 514.

Moreover, the parts and equipment referenced in GCI's proposal and in RCUH's Purchase Order appear to have come from manufacturers such as Siemens, Woodward, and Basler Electric. CR 49, CR 52-53, CR 156-157. GCI made no allegations that any of the equipment it "sourced" from these third parties was manufactured in Texas; instead, Van Vleit asserted that such equipment came from third party "distributors," some of whom he claims were located in Texas. CR 514-515. Further, there was no evidence that RCUH ever on its own initiative instructed, ordered, and/or requested that GCI retain, work with, consult with, and/or obtain parts/equipment from any Texas vendor. CR 439.

Finally, in addition to the foregoing being the type of unilateral contacts Texas and federal courts have held do not establish jurisdiction over foreign defendants, the relevant records reveal that any design, fabrication, and/or assembly work GCI may have performed was minimal, further underscoring its irrelevance to the jurisdictional analysis. Specifically, GCI's August 4, 2012, written proposal and

28

RCUH's September 11, 2012, Purchase Order allot only $16,500.00 out of $286,211.00, or roughly 5% of the total cost, for "engineering design labor, print fabrication and programming" services. CR 49, CR 156-157. The Interim Payment and PLC Proposal Agreement does not appear to call for any "fabrication" and/or "assembly" services at all. CR 441-443, CR 191-196.

The bottom line is that under the contract or contracts at issue herein, the work that GCI was contractually required to perform – upgrading various systems on the KOK (i.e., removing old equipment from the KOK and installing new equipment on the KOK) – took place outside of Texas. CR 42-43, CR 439. Even GCI admits that all of its work on the KOK took place outside of Texas and that all parts, equipment, materials, drawings, analysis, etc., it claims to have provided were actually delivered to RCUH outside of Texas. *See* GCI's Brief at p. 4, n. 6; and, CR 512-514. There is simply no credible evidence that anything in the September 11, 2012 Purchase Order or the Interim Payment and PLC Proposal Agreement required GCI to perform any work in Texas; if it chose to do so, such actions are the type of unilateral contacts that Texas courts have repeatedly held do not suffice to create jurisdiction over a foreign defendant.

**b.     The alleged "long-term relationship" between RCUH and GCI does not establish specific jurisdiction**

GCI asserts that *KC Smash* "is distinguishable in a key respect – the defendant's contacts with the Texas plaintiff...were limited to a *single* contract and

29

did not cover a long-term relationship as is present here." What GCI would have this Court overlook is that the lawsuit it filed concerns GCI's allegations that RCUH owes it money for work GCI performed on the KOK pursuant to two discrete contracts – the September 11, 2012, Purchase Order and an alleged "Second Contract" GCI claims was created in the course of GCI's work under the Purchase Order. CR 6-7. GCI's Petition contains no causes of action concerning anything other than the work it performed under the September 2012 Purchase Order and the alleged Second Contract. *Id*.

Further, the evidence before the trial court established that as with the September 11, 2012, Purchase Order, RCUH's prior purchase orders to GCI were directed to GCI in Louisiana. CR 127-128, CR 593-659. GCI's prior invoices contain only GCI's Louisiana address (CR 129-131, CR 137-140, CR 144-145, CR 151). RCUH's prior communications with GCI included GCI personnel who appear to have been based in Louisiana, not Texas (CR 678-693).

Moreover, the pre-September 2012 contacts alleged by GCI consist entirely of the type that, as discussed above in detail, Texas and federal courts have held do not establish specific jurisdiction (emails with GCI personnel allegedly located in Texas, GCI personnel traveling out of Texas to perform work on the KOK in Hawaii or elsewhere, etc.[15]).

---

[15] *See* GCI's Brief at p. 3, p. 7.

Finally, as set forth below, the opinions GCI claims support its "long term relationship" argument all turned on facts that are simply not present in this case:

- In *Burger King Corp. v. Rudzewicz*, the Supreme Court noted that the defendant "deliberately 'reach[ed] out beyond' Michigan and negotiated with a Florida corporation for the purchase of a long-term franchise and the manifold benefits that would derive from affiliation with a nationwide organization…Upon approval, he entered into a carefully structured 20-year relationship that envisioned continuing and wide-reaching contacts with Burger King in Florida. In light of Rudzewicz' voluntary acceptance of the long-term and exacting regulation of his business from Burger King's Miami headquarters, the "quality and nature" of his relationship to the company in Florida can in no sense be viewed as "random," "fortuitous," or "attenuated." 471 U.S. at 479-80, 105 S. Ct. at 2186. Additionally, the contract at issue required payments to be sent to Florida and also contained a Florida choice of law provision. 471 U.S. at 481, 105 S. Ct. at 2187.

- In *Electrosource, Inc. v. Horizon Battery Technologies, Ltd.*, the Fifth Circuit stated: "HBTL sought out Electrosource for a particular technology that had been developed in Texas, negotiated for its acquisition in Texas, entered into an agreement for the transfer of technology in Texas, and began the process of training, designing, and preparation in Texas necessary to the transfer of the technology. These contacts display that HBTL purposefully availed itself of the privilege of conducting activities within Texas, thus invoking the benefits and protections of its laws." 176 F.3d 867, 873-74 (5th Cir. 1999).

- In *Sw. Offset, Inc. v. Hudco Pub. Co., Inc.*, the Fifth Circuit Court of Appeals found it significant that the telephone books that were the subject of the contract were manufactured in Texas and that the defendant was required to send "camera-ready copy and proofs to Texas in order to facilitate the manufacturing process." 622 F.2d 149, 152 (5th Cir. 1980).

- In *Command-Aire Corp. v. Ontario Mech. Sales & Serv. Inc.*, the Fifth Circuit noted that the plaintiff was a Texas corporation with its principal place of business in Texas; that the president of the defendant company traveled to Texas multiple times to discuss engineering and design

31

specifications; that there was a Texas choice of law and forum selection clause in the contract; that the foreign defendant took possession of and title to the equipment manufactured by the plaintiff in Texas; and that Texas was the place of payment. 963 F.2d 90, 93-95 (5th Cir. 1992).

- In *N. Coast Commercial Roofing Sys., Inc. v. RMAX, Inc.*, the Dallas Court of Appeals relied heavily on the fact that the out-of-state defendant had solicited credit from the plaintiff's Texas office; that the defendant was told in advance that the product it was purchasing was made only at the plaintiff's Texas plant; that payment was required to be sent to Texas; and that the contract contained a Texas choice of law clause. 130 S.W.3d 491, 495 (Tex. App.—Dallas 2004, no pet.).

- In *Retamco Operating, Inc. v. Republic Drilling Co.*, the Texas Supreme Court found that the defendant's "reached out and created a continuing relationship in Texas" because it acquired an interest in real property in interests in Texas, noting that "[u]nlike personal property, [the defendant's] real property will always be in Texas, which leaves no doubt of the continuing relationship that this ownership creates. 278 S.W.3d 333, 339 (Tex. 2009).

- In *360-Irvine, LLC v. Tin Star Dev., LLC.*, the Dallas Court of Appeals held that the defendants established a continuing relationship with the plaintiff and the State of Texas and that by doing so, they purposefully availed themselves of the privilege of conducting activities within the forum, thus invoking the benefits and protections of Texas' laws, because: the parties had entered into a joint venture to develop properties in Texas and offer investment opportunities in Texas; the parties' agreement contained a Texas choice of law and forum selection clause; and the parties' agreement called for the Texas plaintiff to open a Dallas office and to conduct the joint ventures' operations from there. *360-Irvine, LLC v. Tin Star Dev., LLC*, 05-14-00412-CV, 2015 WL 3958509, at *7 (Tex. App.—Dallas June 30, 2015, no pet.) (mem. op.).

- In *Nogle & Black Aviation, Inc. v. Faveretto*, a non-contract case, the 14th Court of Appeals stated: "It is not unreasonable to expect that the choice to use a Texas engineer doing work in Texas to assist with the design of a wing spar modification could lead to litigation in Texas for a claim relating to a wing spar failure." 290 S.W.3d 277, 283 (Tex. App.—Houston [14th Dist.] 2009, no pet.).

32

- In *Rynone Mfg. Corp. v. Republic Indus., Inc.*, the defendant "solicited [the plaintiff's] business in Texas by means of advertisements and solicitations directed specifically to [the plaintiff] in Marshall." 96 S.W.3d 636, 638 (Tex. App.—Texarkana 2002, no pet.).

c. **Alleged "solicitation" of GCI fails to establish specific jurisdiction**

GCI also relies heavily on its argument that RCUH "solicited" GCI's services. As a preliminary matter, RCUH notes that GCI alleges that RCUH has been its continuous customer since 1993.[16] Assuming *arguendo* that is correct, and assuming *arguendo* that RCUH "solicited" GCI at the start of their relationship (neither of which are admitted), this would appear to mean that the relationship began well before 2006, which is when Jack Van Vleit alleges he began managing GCI's relationship with RCUH from Houston (CR 104-105), and thus GCI has offered no evidence that the relationship between RCUH and GCI began in Texas.

Further, other than the self-serving allegations contained in Van Vleit's affidavit, there is no evidence supporting GCI's argument that RCUH "solicited" it. In fact, a review of the email correspondence included with the second Van Vleit affidavit reveals that it was **GCI**, not RCUH, who first proposed that **GCI** itself (as opposed to one of the "number of U.S. companies" GCI claims "RCUH could have engaged to work on the KOK"[17]) perform the upgrades to the KOK that later became the subject of GCI's August 2011 and 2012 written proposals and the September 11,

---

[16] *See* GCI's Statement of Facts at p. 3.
[17] *See* GCI's Statement of Facts at p. 11.

33

2012, Purchase Order that was issued from Hawaii by RCUH. CR 517-519.[18] Thus, even if RCUH did subsequently request that GCI provide it with a written proposal for the upgrade work, the Fourteenth Court of Appeals' opinion in *Parex* is instructive as to why this would not provide a basis for exercising specific jurisdiction over RCUH:

> Accordingly, after Nabors told Parex Canada that Nabors would contact Parex Canada if the ERG SPA did not close, Parex Canada became the solicitor by continuing to contact Nabors. At this point, Parex Canada contacted Texas-based Nabors knowing that Nabors's counter-party was Texas-based ERG. Thus, Parex Canada's Texas contacts as of March 9, 2012 were not based solely on Nabors's unilateral activity or in response to Nabors's inquiries. Nevertheless, Parex Canada's decision to reach into Texas via these contacts was certainly less purposeful than if Parex Canada was independently seeking out a Texas seller without initial prompting from Nabors. Parex Canada was still negotiating to buy Colombian assets from a seller who happened to live in Texas and who had originally reached out to Parex Canada. Moreover, the fact that Texas-based ERG was now part of the equation was based on Nabors's unilateral decision to contract with ERG, not any Parex Canada decision. Hence, although Parex Canada became the solicitor following execution of the ERG SPA, this fact does not support substantial Texas availment.

*Parex*, 427 S.W.3d at 422.

---

[18] RCUH would also note that Van Vleit's email of July 23, 2011, also states that a GCI employee in New Iberia (Louisiana), Tommy Broussard, had been tasked by Van Vleit with locating parts for RCUH, undercutting GCI's emphasis on its Texas "presence" in connection with RCUH.

144163.06501/101687931v.1

## D. RCUH Negated General Jurisdiction

General jurisdiction may be asserted when the cause of action does not arise from or relate to the nonresident defendant's purposeful conduct within the forum state but there are continuous and systematic contacts between the nonresident defendant and the forum state. *Helicopteros*, 466 U.S. at 414–16, 104 S. Ct. at 1872-1873. When general jurisdiction is asserted, the minimum contacts analysis is more demanding and requires a showing of substantial activities in the forum state. *Guardian Royal*, 815 S.W.2d at 228. Usually, the defendant must be engaged in longstanding business in the forum state, such as marketing or shipping products, or performing services, or maintaining one or more offices there. *Parex*, 427 S.W.3d at 416-17. Activities less extensive than that will not qualify for general jurisdiction. *Id*. at 417. As recently stated by the U.S. Supreme Court, "[a] court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Daimler,* 134 S. Ct. at 754; and, *Helicopteros*, 466 U.S. at 414 n. 9, 104 S. Ct. at 1872 n. 9.

*Helicopteros* arose from a helicopter crash in Peru. Four U.S. citizens perished in that accident; their survivors and representatives brought suit in Texas state court against the helicopter's owner and operator, a Colombian corporation,

whose contacts with Texas were confined to "sending its chief executive officer to Houston for a contract-negotiation session; accepting into its New York bank account checks drawn on a Houston bank; purchasing helicopters, equipment, and training services from [a Texas-based helicopter company] for substantial sums; and sending personnel to [Texas] for training." 466 U.S. at 416, 104 S. Ct. at 1873. The Supreme Court held that there was an insufficient basis for exercising general jurisdiction, noting that "mere purchases, even if occurring at regular intervals are not enough to warrant a State's assertion of in personam jurisdiction over a nonresident corporation in a cause of action not related to those purchase transactions." 466 U.S. at 418, 104 S. Ct. at 1874.

In *Parex*, the Fourteenth Court of Appeals held that a Canadian company was not subject to general jurisdiction in Texas. *Parex*, 427 S.W.3d at 433. The Court of Appeals' analysis is set forth in full as follows:

> Parex Canada does not conduct business, market products, pay taxes, or have offices, bank accounts, property, employees, or a registered agent, in Texas. Since its incorporation, Parex Canada has engaged in the following Texas contacts aside from the $75 million Parex SPA:
>
> - In November 2010, Parex Canada made certain filings with the Texas State Securities Board relative to a Texas investor who purchased, without any solicitation from Parex Canada, a relatively small amount of shares of Parex Canada's common stock.
>
> - During a layover in Houston in February 2011, Parex Canada vice-president Taylor had a meeting with other non-Texas

entities regarding development of Colombian assets. Later, Parex Canada conducted due diligence in Texas regarding these assets, but a deal never materialized.

- In March and June 2011, Parex Canada personnel attended meetings in Houston regarding the purchase of the Colombian-based Remora assets. One of the Remora entities had a Houston office. This deal materialized, and Parex Colombia purchased the assets for $255 million. The transaction closed in Bermuda. Apparently, Texas-based Nabors entities and personnel were involved in this transaction.

- In October 2011, Parex Canada contracted to purchase software from a company that maintains a Houston office. The contract contains Texas-based forum-selection and arbitration clauses. However, Parex Canada deals exclusively with Canadian-based personnel of the company.

- In November 2011, Parex Canada purchased equipment from a non-Texas entity which unilaterally chose to ship the equipment to Houston, at which point Parex Canada paid for the equipment to be shipped to Trinidad by a Houston-based company. Parex Canada engaged in similar transactions between December 2011 and February 2012.

- In January 2012, Parex Canada held a managers retreat in Houston, which was a central location relative to the location of the Parex entities. Several officers attended, including Pinsky, Taylor, and Parex Canada CEO Wayne Foo. The meeting did not involve any discussion regarding solicitation of Texas business.

- Also in January 2012, Foo remained in Texas after the managers retreat to participate in several informational sessions regarding investor relations. Foo did so at the request of a separate Canadian-based entity which is a party to an underwriting agreement with Parex Canada. During the sessions, Foo provided publicly available information regarding Parex Canada for purposes of creating awareness of Parex Canada stock, not to actually sell stock. Parex Canada engages in over 150 such sessions per year around the world.

37

- Also while attending the January 2012 managers retreat, a Parex Canada employee met with a Houston-based subsidiary of a Canadian company to discuss operational matters regarding drilling in Trinidad. Parex Canada did not enter into any contracts as a result of this meeting.

- Finally, on multiple occasions, Parex Canada personnel have made phone calls from Houston during layovers.

These contacts are simply too sporadic to permit a Texas court to exercise general jurisdiction over Parex Canada. For a corporation, the paradigm forum for the exercise of general jurisdiction is the place in which the corporation is fairly regarded as at home. A corporation's continuous activity of some sorts within a state is not enough to support the demand that the corporation be amenable to suits unrelated to that activity.

Clearly, Parex Canada's trips, activities, and purchases in Texas have not rendered Texas as Parex Canada's home or even an intermediate place of business. Additionally, many of the aforementioned contacts were fortuitous and not purposeful, such as a third party choosing to send equipment through Houston, a Texas individual choosing to invest in Parex Canada, and a Canadian-based entity requesting a Parex Canada officer conduct informational sessions in Texas. Even Parex Canada's involvement in significant expenditures—$255 million for the Remora assets and $75 million for the Ramshorn assets—are not enough to subject Parex Canada to general jurisdiction. We hold Parex Canada does not have continuous and systematic contacts with Texas, and the trial court may not properly exercise general jurisdiction over Parex Canada.

*Parex*, 27 S.W.3d at 431-33 (internal citations omitted).

The evidence submitted with this Special Appearance establishes that there is no basis for exercising general jurisdiction over RCUH. As stated above, RCUH, is not and never has been a resident of the State of Texas. CR 41. RCUH is an agency of the sovereign State of Hawai'i, established by the Hawai'i Legislature in 1965,

38

and is attached to the University of Hawaiʻi for administrative purposes. *Id*. Its enabling legislation is codified as Chapter 304A, Sections 3001 to 3011 of the Hawaiʻi Revised Statutes. *Id*. The fundamental mission of RCUH is to support the research and training programs of the University of Hawaiʻi and to enhance research, development, and training generally in Hawaiʻi. *Id*. Its principal place of business is located in Honolulu, Hawaiʻi. *Id*. RCUH has no offices in Texas. *Id*. It does not have a registered agent for service of process in Texas. *Id*. RCUH has no bank accounts, property or assets in Texas and does not own or lease any interest in any real estate or other assets in Texas. *Id*. It does not design, manufacture or sell products in Texas. CR 42. Finally, RCUH does not recruit Texas residents, directly or through any intermediary located in Texas, for employment inside or outside Texas. *Id*.

GCI claims in its Response that "RCUH's broad reach into Texas through other service providers subjects it to personal jurisdiction in a Texas court under a general jurisdictional inquiry."[19] GCI identified only two "service providers": Stewart & Stevenson and ABS. RCUH's contacts with Stewart & Stevenson are simply in no way sufficient to establish general jurisdiction over RCUH, as shown below:

- RCUH's records indicate that between 1998 and September 9, 2012, RCUH ordered parts and/or equipment for the KOK from Stewart &

---

[19] *See* GCI's Brief at p. 20.

Stevenson that Stewart & Stevenson shipped or sent to locations outside the state of Texas. RCUH's records indicate that the last of the parts and/or equipment it ordered from Stewart & Stevenson were delivered by no later than October of 2012. CR 439.

- While certain parts/equipment Stewart & Stevenson provided to the KOK potentially could have been affected by GCI's work under the September 2012 Purchase Order, RCUH is unaware of Stewart & Stevenson having any involvement in GCI's work on the KOK after the September 11, 2012, Purchase Order was issued. *Id*.

- RCUH's records show that between 1998 and October 30, 2012, payments from RCUH to Stewart & Stevenson totaled $226,861.50. RCUH's records show that no payments have been provided to Stewart & Stevenson after October 30, 2012. *Id*.

The same is true for ABS.[20] The services ABS provided to RCUH for the KOK were performed by personnel from ABS offices outside of Texas in places including Honolulu, Portland, Seattle, and Panama, and RCUH's communications with ABS were with non-Texas offices/personnel. CR 362-385, CR 398-414, CR 439, CR 449-463. Further, RCUH's records only contain the following three references to ABS Houston personnel:

a. in a report on a survey conducted in Honolulu on January 11, 2011, there is a note stating that "Any modifications to existing ABS Approved Main Propulsion drive train to be submitted to ABS Houston Engineer for approval prior to commencing modification (CR 401);

b. in a report on a survey conducted in Honolulu on February 4, 2012, there is a note stating that manuals for a winch were to be submitted to the appropriate Houston Ship Engineering Department before the next annual hull survey (CR 405); and,

---

[20] As set forth in RCUH's Statement of Facts at p. 8, RCUH denies ABS is a "Texas vendor."

c.  in a report on a survey conducted in Honolulu on November 20, 2012, there is a note indicating that the winch manual had been submitted (CR 411).

Finally, RCUH's records reflect only a total of $55,831.00 in payments to ABS for the services to the KOK between September 2010 and January 2015. CR 464-477.

It is well-settled law that merely purchasing goods or services from a Texas vendor or vendors does not establish general jurisdiction. *See American Type Culture Collection*, 83 S.W.3d at 808 ("ATCC contends that its purchases from Texas vendors 'do not provide evidence warranting the exercise of general jurisdiction over ATCC.' We agree."); *Helicopteros*, 466 U.S. at 418, 104 S. Ct at 1874 ("[M]ere purchases, even if occurring at regular intervals, are not enough to warrant a State's assertion of in personam jurisdiction over a nonresident corporation in a cause of action not related to those purchase transactions."); *Dalton v. R & W Marine, Inc.*, 897 F.2d 1359, 1362 n. 3 (5th Cir. 1990) ("[P]urchases and trips related thereto, even if they occur regularly, are not, standing alone, a sufficient basis for the assertion of jurisdiction."); *Parex*, 427 S.W.3d at 432-33); ("Clearly, Parex Canada's trips, activities, and purchases in Texas have not rendered Texas as Parex Canada's home or even an intermediate place of business."); and, *Internet Adver. Group, Inc. v. Accudata, Inc.*, 301 S.W.3d 383, 392 (Tex. App.—Dallas 2009, no pet.) (purchases from Texas vendors do not establish general jurisdiction). Taken as a whole, RCUH's contacts with ABS (to the extent they were in Texas) and Stewart

41

& Stevenson are not so 'continuous and systematic' as to render RCUH essentially at home in Texas.  There is no general jurisdiction over RCUH.

**E.    Exercising Jurisdiction over RCUH Would Violate Traditional Notions of Fair Play and Substantial Justice**

Even if the Court determined that RCUH somehow has minimum contacts with Texas – which it clearly does not – exercising jurisdiction over RCUH would still violate the traditional notions of fair play and substantial justice guaranteed by the United States Constitution. In making this determination, a court looks to five factors: (1) the burden on the defendant; (2) the interests of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies. *Guardian Royal*, 815 S.W.2d at 228.

The burden on RCUH to defend itself in Texas rather than its home jurisdiction in Hawai'i would be significant.  If the claims against RCUH were allowed to continue in Texas, employees and/or representatives of RCUH would be forced to travel to Texas to assist in the defense. The costs and time associated with such travel is considerable.  In addition, while Texas may have an interest in providing a forum for its citizens, there is no reason to believe that Texas's interest is more substantial than that of Hawaii, where RCUH resides.  As stated above, it is

42

not even clear that GCI is a citizen or resident of Texas. Based on the foregoing, Texas's interest in adjudicating this dispute would appear to be minimal, at best. *See Alstam Power, Inc. v. Infrassure, Ltd.*, 2010 WL 521105, at \*6 (Tex. App. —Austin 2010, no pet.) (mem. op.).

In sum, the assumption of jurisdiction by this Court over RCUH would offend traditional notions of fair play and substantial justice and deprive it of due process as guaranteed by the Fourteenth Amendment to the United States Constitution. See *Guardian Royal*, 815 S.W.2d at 232. The trial court's order should be affirmed.

## CONCLUSION AND PRAYER

For all these reasons, Appellee The Research Corporation of the University of Hawai'i respectfully requests that the trial court's order granting its special appearance be affirmed, and for such other and further relief to which it may show itself to be justly entitled.

144163.06501/101687931v.1

Respectfully submitted,


    /s/ *David G. Meyer*
Michael K. Bell
State Bar No. 02081200
David Meyer
State Bar No. 24052106
BLANK ROME LLP
717 Texas Ave., Suite 1400 Houston,
Texas 77002
Telephone:  (713) 228-6601
Facsimile:   (713) 228-6605
Email: mbell@blankrome.com;
dmeyer@blankrome.com
**Attorneys for Appellee, The
Research Corporation of the
University of Hawai'i**

44

## CERTIFICATE OF SERVICE

Pursuant to Rules 6.3 and 9.5(b), (d), and (e) of the Texas Rules of Appellate Procedure, I hereby certify that a true and correct copy of the foregoing instrument was served on all counsel of record on this the 5th day of November, 2015, as follows:

***Via first class mail, email and electronic service:***
Jeffrey B. Kaiser
Kaiser, P.C.
Enterprise Bank Tower
2211 Norfolk, Suite 528
Houston, Texas 77098

and

Kelley M. Keller
State Bar No. 11198240
Ellison & Keller, P.C.
5120 Woodway Drive, Suite 6019
Houston, Texas 77056

/s/ *David G. Meyer*

- 45 -

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Texas Rule of Appellate Procedure 9.4(i)(2) because this brief contains 11,955 words, excluding the parts of the brief exempted by Texas Rule of Appellate Procedure 9.4(i)(1).

2.      This brief complies with the typeface requirements of Texas Rule of Appellate Procedure 9.4(e) and the type style requirements of Texas Rule of Appellate Procedure 9.4(e) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font or larger.

_____/s/ *David G. Meyer* _____

- 46 -

# APPENDIX TAB A

# CITATION

| | |
|---|---|
| **GULF COAST INTERNATIONAL LLC** | **Case: 00126822** |
| | **Division: E** |
| **VERSUS** | **State of Louisiana** |
| | **16th Judicial District Court** |
| **THE RESEARCH CORPORATION OF THE** | **Parish of Iberia** |
| **UNIVERSITY OF HAWAII** | |

To: **THE RESEARCH CORPORATION OF THE UNIVERSITY OF HAWAII**
**\*\*VIA LOUISIANA LONG ARM STATUTE\*\***
**C/O MR. ROBERT E. HUNT, MARINE SUPERINTENDENT**
**2800 WOODLAWN DRIVE, SUITE 200**
**HONOLULU, HONOLULU COUNTY, HAWAII 96822**

of          Parish

You are hereby summoned to comply with the demand contained in the **PETITION** of which a true and correct copy (exclusive of exhibits) accompanies this citation, or make an appearance, either by filing a pleading or otherwise, the 16th Judicial District Court in and for the Parish of Iberia, State of Louisiana, within thirty (30) days after the service hereof, under penalty of default.

WITNESS MY HAND AND OFFICIAL SEAL OF OFFICE AT NEW IBERIA, LOUISIANA, THIS 24 DAY OF AUGUST, 2015.

Michael Thibodeaux
Clerk of Court
16th Judicial District Court
Parish of Iberia

_____
**Deputy Clerk of Court**

Requested by:
JULIUS W. GRUBBS, JR.
P. O. BOX 11040
NEW IBERIA, LA 70562

[SERVICE COPY]

GULF COAST INTERNATIONAL, L.L.C.   16th JUDICIAL DISTRICT COURT

VERSUS NO. 126822-E          PARISH OF IBERIA

THE RESEARCH CORPORATION
OF THE UNIVERSITY OF HAWAII   STATE OF LOUISIANA

## PETITION ON OPEN ACCOUNT

NOW INTO COURT, comes Gulf Coast International, L.L.C., (GCI) a Louisiana Limited Liability Company domiciled in Iberia Parish, Louisiana, which respectfully represents:

1.

Made defendant herein is The Research Corporation of the University of Hawaii, (RCUH) a Hawaii Corporation domiciled in Honolulu County, Honolulu, Hawaii and doing business with petitioner in New Iberia, Iberia Parish, Louisiana.

2.

The defendant is justly, truly and legally indebted unto petitioner in the full and true sum of at least Five Hundred Seventy-One Thousand Two Hundred Seventeen Dollars and 36/100 ($571,217.36), together with legal interest thereon from date of judicial demand, until paid, for a reasonable amount of attorney's fees, and all costs of court, for the following reasons:

3.

Petitioner provided parts, goods, equipment, and labor, on open account and/or under terms of a contract with the Research Corporation of the University of Hawaii in 2013 and 2014.

4.

From the period of June 20, 2013 through and including October 9, 2014, GCI provided on open account and/or under the terms of the contract labor, mileage, and materials totaling at least the sum of Five Hundred Seventy-One Thousand Two Hundred Seventeen Dollars and 36/100 ($571,217.36) for materials, goods, equipment, and labor services provided to the defendant from June 20, 2013 to October 9, 2014, being Invoice Nos. 29488, 29489, 29490,

30032, 30068, 30069, 30098, 30099, 30100, and 30108, a true and correct record of which is attached hereto collectively as Exhibit "1" and made a part hereof.

5.

Despite amicable demand, sent to Michael J. Nakano, Esq., of the law firm Frame & Nakano, the attorneys and counsel for RCUH, via email on June 30, 2014, a copy of said demand letter, transmittal email, and original petition attachment attached hereto collectively as Exhibit "2", there remains outstanding the total amount herein sued for.

6.

At all times pertinent, RCUH did business with GCI, on open account in Iberia Parish, Louisiana where portions of the work and services were performed under the terms of an open account agreement and thus, jurisdiction and venue is proper under the LA. CCP Art.74.4.

WHEREFORE, petitioner Gulf Coast International, L.L.C. prays that the defendant The Research Corporation of the University of Hawaii be served with a copy of this Petition, duly cited and that after due proceedings had, there be judgment herein and in favor of Gulf Coast International, L.L.C., and against the defendant, The Research Corporation of the University of Hawaii, in the full and true sum of at least Five Hundred Seventy-One Thousand Two Hundred Seventeen Dollars and 36/100 ($571,217.36), together with legal interest thereon from date of judicial demand, until paid, and a reasonable amount of attorney's fees, and all costs of these proceedings.

RESPECTFULLY SUBMITTED:

BY: _____
JULIUS W. GRUBBS, JR. (#6361)
LEON J. MINVIELLE, III(#09647)
Haik, Minvielle & Grubbs
1017 E. Dale Street
Post Office Box 11040
New Iberia, LA 70562-1040
Phone: (337) 365-5486
*Attorney for Plaintiffs, Gulf Cost International, L.L.C.*

**PLEASE SERVE DEFENDANT (Via Louisiana Long Arm Statue):**
The Research Corporation of the University of Hawaii
C/O Mr. Robert E. Hunt, Marine Superintendent
2800 Woodlawn Drive, Suite 200
Honolulu, Honolulu County, Hawaii 96822

Filed Aug 19, 2015
Signed: Phyllis D. Nelson, Dty. Clk.
A TRUE COPY

ATTEST: Phyllis D. Nelson
Dty. Clerk of Court
Iberia Parish, La

**GULF COAST INTERNATIONAL, L.L.C.**   16th **JUDICIAL DISTRICT COURT**

**VERSUS NO.** 126822-E   **PARISH OF IBERIA**

**THE RESEARCH CORPORATION**
**OF THE UNIVERSITY OF HAWAII**   **STATE OF LOUISIANA**

---

## VERIFICATION OF PETITION AND
## AFFIDAVIT OF TRUTHFULNESS OF AMOUNT OWED

STATE OF LOUISIANA

PARISH OF IBERIA

BEFORE ME, the undersigned Notary Public, there did personally come and appear Gulf Coast International, L.L.C, through its Member/Manager, James Patrick Edgar, who after being duly sworn did depose and say:

That he is the Member/Manager of Gulf Coast International, L.L.C, a Louisiana Limited Liability Company domiciled in Iberia Parish, Louisiana; he is duly authorized to make this affidavit and is familiar with the account of The Research Corporation of the University of Hawaii.

That all of the allegations of the Petition are true and correct to the best of his knowledge, information and belief.

Further, the attached Exhibit "1" Invoices are a correct statement of the parts and labor performed for this debtor from January 3, 2013 through and including June 30, 2014, and there is currently due and owing a balance of at least Five Hundred Seventy-One Thousand Two Hundred Seventeen Dollars and 36/100 ($571,217.36) on said invoices and account.

Further, the attached Exhibit "2" reflects that amicable demand was made upon RCUH on/or about June 30, 2014.

BY: _James R. Edgar_
**James Patrick Edgar,**
**Member/Manager**

**SWORN TO AND SUBSCRIBED** before me this _17th_ day of August, 2015.

_____
NOTARY PUBLIC

Filed _Aug 19_, _2015_
Signed: Phyllis D. Nelson, Dty. Clk.
A TRUE COPY

ATTEST: _Phyllis D. Nelson_
Dty. Clerk of Court
Iberia Parish, La